May it please the Court. Good morning, Your Honors. Good morning. James Andre Bowles from Reno, representing the appellant in this case, who is the plaintiff in the case below, or the plaintiff in the case below. The Lepi or Avalos family is two parents, young parents, with three children at the time, who ranged in age from, I think, either 10 or 11 to 13. They lived in a mobile home, downtown Carson City, and lived there with a cousin who was also the nephew to Mr. and Mrs. Avalos, and an uncle, an older guy, older as in probably over 40. The facts in this case are that this involved, the police were involved in the investigation of a relatively innocuous crime, that is, possession of marijuana at a different location that had absolutely nothing to do with the Avalos family. Although the officers who searched didn't know that at the time, that it was the wrong location. That's correct, Your Honor. They didn't have knowledge one way or the other. They merely had an address of 58 Tiger Drive, or Tiger, I think it is Drive. And the fact is that there was no risk involved based on the information the officers had. It wasn't that you're going to search a place where you're going to encounter Mr. Hill, who's violent and armed and has threatened to kill officers. There were little kids. They determined upon arrival at the place and knocking on the door and having the door open, that there were little kids in the one deputy's statement. He referred to them as little kids who opened the door. They ultimately found out that they were, in fact, at the wrong house, that this woman they were looking for had nothing to do with that place. Perhaps, perhaps sometime in the past, relatively distant past, she might have lived there or had that address, but there was no information. And when they got there, they found out she didn't belong there, that they then entered the house without announcing themselves. At least one of the people in the house. Say they found out that she didn't live there before they entered the house? No. No, Your Honor. Once they got, once they entered the house, they found out that she had, there was no connection. In other words. It was after this whole incident with the shower and all that went down, isn't it? That's correct, Your Honor. That is correct. As far as when they went in, they were conducting a search of a suspected marijuana stash house or whatever, correct? Well, the stash was somewhere else. No indicia that there was any marijuana there. It's just an unsupported statement. What was the search warrant for? For marijuana and indicia. Okay. That's what they were looking for. That's correct. And their state of mind when they went in, at least on this record we're taking, is that they were looking for evidence of drug possession, distribution, whatever. Correct, Your Honor. Now, this is a single-wide mobile home. What's a single-wide? I'll have to confess. It's just a normal mobile. Single-wide. Double-wide is when you can split them out and add a considerable space. You can put two of them together and you might get 28, 30 feet out. Well, 28 feet. Okay. So what, just, can you just set the scene? Because this little, the incident in the shower takes place down the corridor of this mobile home. I'm trying to get a sense of the size. How big, do we know what the square footage is? The square footage, I'm not sure, but a mobile home can only be 14 feet wide to go down the highway, and I don't think you can have anything longer than 60 feet total. Okay. So when they then come in, their family is sitting up in the front entry part where the, normally the steps are. They come in there and the family is sitting in that area. In the living room.  And then the two officers go down the hallway and they encounter Felipe in the shower. They find Filiberto in the shower, Your Honor. Okay. And so then they have this, the scuffle and the beating and everything else that involves him. And that takes place where and how far away from the family in the living area? They start in the bathroom, go through the hallway, which is a relatively short hallway, and end up in the living area where the family is. And the family is there present watching what occurs to Filiberto Lepe. So the hitting on the head with the gun takes place immediately in front of the family. Well, it starts in the hallway and gravitates into where the family is either in the bathroom or in whatever state they're in under arrest. Do we have evidence that Filiberto is moving down toward the family from the bathroom as he's being hit? He is, Your Honor. Where is that evidence? Oh, as far as, well, he describes it fairly well in, if you look at the Respondent's Excerpt of Record. Well, I guess it would be better to look at Appellant's Excerpt of Record. I have it here. What page?  Page 45, Answer to the Interrogatory by Jesus Avalos Venturas. He, Hola beat my nephew savagely in my presence. That's line number nine. Yeah, I read that. But that doesn't tell us where in the mobile home. It doesn't tell us that he moved while he was being beaten from the bathroom toward the living area. It doesn't say any of that. It doesn't, Your Honor. But if we look at the totality of the evidence, it's clear that everybody is detained in the same area. That is. Is there something in the record, kind of following along with Judge Fisher's question, to tell us what the distance is between the bathroom where Filiberto was taking a shower and the area where the rest of the family is being detained? The distance? No, it doesn't, Your Honor. To what extent? We don't know that. Yeah. And do we know how far then Filiberto was from the rest of the family as he was being beaten? Obviously, this is a small mobile home. I understand that. We don't have the distance that he traveled, Your Honor, nor the distance from there to there. But if we look at Holub's testimony in, I believe, it wasn't a – I don't think it was a deposition, but Holub describes how it happened, how it started there, and how they went out into the hallway. Then if we put that together with Jesus Avalos, we've got them all together in the same room because they're all detained in the living area. Well, the living area and the hallway are different. Well, that's correct, Your Honor. But the only – Jesus Avalos was in the living area. That's where he was taken to the ground and then later put on a couch. And that's where the testimony puts – that's where his testimony puts the beating in his presence. Well, presence is an ambiguous word. Well, I would – I would agree with that, Your Honor. But I don't think that's ever been taken issue, that this occurred in his actual presence. Well, I'm not sure your case stands or falls on what distance there is, but I could not remember anything in my reading from the excerpts of the record that corroborated your description of the evidence as, as he was being beaten, he moved from the bathroom down toward the living area. And that was not made clear, Your Honor. It's not in the record. Well, I think if we look at everybody's – everybody's testimony, Your Honor. And the excerpt on page 26, where we have the memorandum decision in order, it says, the two officers were successful in subduing Bilberto. Once under control, Bilberto was handcuffed and taken into the living room. That's – that was a mistake on the part of the courts, Your Honor, because that was not, in fact, the case. In fact, the case was, and it's never been at issue, that he was actually beaten in the living room where the children, who were the only ones who could speak Spanish, explained to him that they were police and that he had to get down on the floor. But I apologize to the Court. That was not made clear in the record. All right. In fact, that was what happened. But if it's not made clear in the record and we have a finding of fact by the district judge, what are we supposed to do? It sounds like clear error to us. I mean, that's the only way we can get rid of that, right? Well – Or just on summary judgment, I guess all you've got to do is point to evidence to the contrary. But unless you've got evidence to the contrary in the record – Well, Your Honor, if we look at, well, I'll submit it to the Court. In fact, we know that it was in a mobile home. The children talked about observing this, about the guns out. Yes. And I think the kids' testimony back up what Jesus Avalos had to say. Now, we don't have testimony. We have professors' interrogatories. Isn't that correct? That plus Filiberto Lepi's testimony, Holub's testimony. But do we have testimony from the children? You just referred to their testimony. No. The only – we have answers to the interrogatories from the children. That's – and they talked about what occurred and what they – what their observations were. And what was the range in ages, you said? Either 10 or 11. She would have been – one of them, the youngest, would have been at least 10, perhaps 11, and the oldest was 13. So what we have is, with – as far as Filiberto Lepi, and this is in his testimony, he makes it very clear that he never had a knife, that the knife issue was raised by Mr. Holub. Mr. Holub admits to pistol-whipping Mr. Lepi 8 to 10 times, that he was bleeding, that – and it's also in the record that these are Spanish-speaking people. In fact, the children all spoke English, but the adults who were Spanish-speaking people did not speak English, or at least the officers didn't know if they did or not, that in the long – You know, Lepi, Filiberto is not the one who's before us. The issue before us today, as I understand it, is what do we do about the claims of the family who were exposed to all of this? And as I understand, your theory is that they were proximate to and observed and affected by the beating of Filiberto, the pistol-whipping, if you will, in their presence. Now, what – assuming we take that scenario as favorable to your clients, to the plaintiffs, then where do we go from there? What does it lead to? Well, Your Honor, it gives rise to – first off, it gives rise to a Fourth Amendment manner of seizure, and I would compare the case to Franklin v. Foxworth, Your Honor, where they speak of, in that case, it was an elderly, infirm individual. In this case, it's children. They talk about children in the Franklin-Foxworth case. There were guns involved in both, but in this case, guns were used in an extreme manner, which we don't have in the Foxworth case, at least not reported. In this case, the children testified that guns were pointed at them. The – one of the parents in the interrogatory talks about that. Mr. Holub, Deputy Holub, admits to having his gun out. They came in. They didn't say, were police officers. They said, it's Paco here. After Paco, this little ruse with Paco, which I don't understand, but after the ruse with Paco, Holub pulls his gun, they go in. And I don't think it's disputed anywhere that they pointed guns at these little children. In this particular case, unlike the Foxworth case, the elderly man in Foxworth was not brutalized. He wasn't – and nobody brutalized anybody in his presence. In this case, you've got children and parents where you've got extreme violence involved with how Holub treated Mr. Lepe. Again, in this case, we're talking about allegedly they're looking for marijuana in the Foxworth case. That dealt with somebody who would, I believe, in my recollection is, you're talking about somebody there who was a gang member. There was somebody, a younger person, living in the house. They had something to be concerned with. In this case, what are we looking at? We open the door, there's three small children. There's a family, a mom and dad, an 18-year-old boy in the shower. Now, counsel, since time is fleeting, let me just ask the question that's troubling me, and that's about the qualified immunity. Now, what clearly established constitutional right of the Lepe family did Holub violate when he beat Filiberto in their presence? What was the clearly established constitutional right at that point? Well, not only beating the right, the Fourth Amendment right to be free from unreasonable seizures, and in Franklin v. Foxworth and Liston v. Riverside County, they both talked about that, the manner of serving the search warrant. In this case, it would be a quantum leap to believe that Deputy Holub thought that his pointing a gun at children and his beating an 18-year-old young man who's in the shower with his pistol would take a quantum leap to get to the point where this is objectively reasonable behavior while serving a search warrant for marijuana. Filiberto is out of the case now. We're talking only about the family. That's my question. And obviously, but when he did this in front of these children, the children who said in their interrogatories that they feared one of the children said they feared they were going to be killed. And the suggestion is, and I think it might have been used, or the word might have been used, there's some testimony about they didn't know that these were police officers. They just thought they were being robbed. So is it your contention that in order to show clearly established violation, you have to prove that the children thought the police activities were implicitly directed at them as well, or is it simply along the lines of your emotional distress claims that they were exposed to violence directed at a family member? Where do we fall in that range for purposes of a constitutional violation? Both, Your Honor. Very simply, there's a case, and it's mentioned in here, about a child, and it's an emotional distress claim. It's not a Fourth Amendment claim. That's what I'm trying to understand. On the Fourth Amendment claim, I understand emotional distress. Set that aside. I'm trying to understand where what you have to prove to push it into the Fourth Amendment constitutional violation. If we look at Liston v. Riverside County and Foxworth, where these people were subjected to this treatment, and Liston v. Riverside County involves family. It's a family where the dad was thrown to the ground and treated very roughly. And it didn't just involve the dad. It involved the whole family. This is not a bystander case. But if you ---- So you acknowledge that it has to be something more than just observing it. It has to be ---- creates an objectively reasonable expectation on their part, or fear on their part, that this somehow is directed at them, rather than simply being exposed to maltreatment of one of their family members. I acknowledge that ---- I don't know if I'd say I do acknowledge that, Your Honor. What I think I'm saying is ---- I know I'm saying this ---- is we don't have to go there. Because these kids were there when it happened. They had guns pointed at them, and they had this occurring in their presence. And in this case, they state in their answers, it's in the evidence, that they were afraid, or at least one was afraid, that she was going to be killed. So, okay, it's Mr. Lepe transfers to the entire family. It's not a bystander case, but it transfers to the entire family. And it raises a sphere that is made clear when you read those answers. And if I may, Your Honors, I'd like to ---- we're already at almost done. Thank you, Your Honor. Thank you. Good morning. May it please the Court. My name is Mark Forsberg. I'm a deputy district attorney for Carson City, Nevada. And I represent the city and the other employees in this case. I'd like to address a couple of the facts. First of all, these officers went to this residence not on a whim or conjecture, but because a search warrant was issued for that address. And the officers who went there did not participate in obtaining the warrant.  What they did know, though, is that the genesis of the search warrant was the discovery of not an innocuous small amount of marijuana, but over 100 pounds of marijuana in a van and in a storage unit leased or owned by the woman who gave this place as her address. So they had reason to believe that it was a very serious crime and that the people in this place might be more than just a family or people who had a small amount of marijuana, that there was trafficking type amounts of drugs there. When they went in, we know from Michigan v. Summers that they have the authority under the Constitution to exercise complete control over that situation in the home. And that's what they did with respect to the family members as opposed to Filiberto. There was nothing prolonged or degrading about their detention or the way they were treated. The officers had guns out. There's testimony that the officers had their guns in a ready position, but not pointed directly at people. Testimony from? I believe that was from Deputy Holub at his, at a preliminary hearing. But we've got at least interrogatory answers from the children that say pointed at them. Pointed at them. But I want to distinguish that from the aggravating circumstance of having them pointed at their heads or something like that. Certainly the officers went in with their guns out and doing, you know, pointing them around as they always do. But as soon as it was, as soon as the family members were compliant, and they were very quickly compliant, they were all seated on the couch and there was nothing further degrading about it in view of the cases that we're talking about. Liston, they're escaping my mind right now, but in those cases, people were kept for prolonged periods of time, 2 to 3 hours. Deprived of their clothing and that kind of thing. But what he's driving at is that the guns were out, pointed in the direction of these kids, and then this violent activity takes place within their presence. So can you get to that part of it? Is there any dispute that some of this violent confrontation occurred immediately in their presence? No, there isn't, Your Honor. I wouldn't dispute that. I agree it's a very small place. I think that the dispute or the fight between Deputies Holub and Gerlach and Filiberto Lepe did spill into the living room. It was over very quickly. But nothing was done to the family members. Okay, now the district court found, and I guess there's even been a resolution of the case involving Filiberto, that there was excessive force with regard to him. Well, I think the district court found that there was a dispute. A dispute. A factual dispute sufficient to preclude summary judgment. Yes. Okay. But in any event, at this point, the record is that there was the scene with the family and then enough to get to a jury on excessive force as to what was done to Filiberto. Why isn't that enough, then, to create a circumstance that creates a tribal issue with regard to the family as to whether this violent excessive force also had an effect on them, directed at them, as opposed to? And that's why I was trying to get counsel to draw the line, and you heard how he did or didn't draw the line. How do we look at it vis-a-vis the family when we have family with guns drawn, with kids in it, guns drawn against them? Granted, it's not prolonged, but that puts them in apprehension, arguably. And then this violent activity that escalates right into their immediate presence. Why doesn't that create enough of a tribal issue as to whether there was an unreasonable search, execution of the search? At that point. Okay. First of all, I think it's important to distinguish between the family members and Filiberto Lepi. We're here because the family members allege that they were searched or seized or that the warrant was executed in an unconstitutional manner as to them. Right. That's what I'm asking. Okay. So that's different than what happened to Filiberto Lepi. But he's part of the circumstance. He is part of the circumstances, and I think these questions are more appropriately answered under the State law claims for evidence. But why doesn't it become a – let's suppose that the police officers had come upon this family and they summarily executed the guy in their presence. You don't think that that would be intimidating and constitute an unreasonable search as to the family as well? Well, I think, you know, I think in an extreme case that it does become an unreasonable search. But in this case, as to the family members, they were not treated unreasonably. As to Filiberto Lepi and what led to that, there's a dispute about those facts. Filiberto Lepi himself has wrote a statement when he got to the jail that said, I took a knife and resisted the officers. I'm accepting all of that. Okay. I'm trying to understand, though, when we have a record that says there is a triable issue of fact where those disputes may get ironed out before a jury, where the gestalt of this encounter is that a family in a confined space with guns drawn as against the family and a severe beating of one of their family members takes place in their immediate presence, why that bundle of activity, disputed as it may be, but why that doesn't create a sufficient case to go to the jury of whether the search as to them was executed in an unconstitutional manner? Well, again, Your Honor, I think that the facts of the case show that the search warrant was not unreasonably executed against any of the family members and that it wasn't until Filiberto Lepi became involved with the police that this other ruckus took place. So the officers were not there doing anything unreasonable. They didn't detain the family too long. They didn't treat them poorly. They didn't make them stand out in the cold or stay for hours on end or any of those kinds of things that lead us to believe that there was a mistreatment of them in any way. They went in as they're allowed to do. They took command of the situation. That's not always a pleasant or polite process, nor does it have to be. Again ---- Let's assume, without really assuming, that it was reasonable for Holub to pistol-whip Filiberto. Is it unreasonable for him to do this in the presence of children? Well, it's ---- if we assume in this hypothetical that it was reasonable to do it, he has very little control over where he does it. This was a fight. It wasn't a deliberate, reasoned event where an officer brings somebody into a room and then beats him up because his family's there. It was a fight. Well, the real question is the officers knew children were present. Should officers be required to modify their behavior because children are present? I think that officers should modify their behavior if there are children present, if they have control of the situation to do so. But here, that's not the case. Deputy Holub, Deputy White, who was also in the shower, and Deputy Gerlach, who also had to assist in subduing Mr. Leffy, had no control over how that was going to be done, nor did they have any information about him or why he was acting this way. They had to get control of the situation for their own safety and for the safety of others so that it didn't become something else. They didn't ---- they just didn't have a choice to say, there's children here, we're going to stop fighting with this person. Is Detective Holub still employed by the same person? No, he's not. He's retired. And how long was he a deputy? He was a deputy for many, many years. And I think one thing I might say about that, and I hesitate to bring it up, is that, but it's in the appellant's brief that he was the subject of previous excessive force claims that went to trial. And in both of the cases, he was exonerated of using excessive force by a jury. So I don't think that there's anything we know about Deputy Holub in this record that would suggest that he had a history of it, that he was prone to do it, that his employer knew he was going to do it or had information to believe that he should have been disciplined in the past or anything like that. He was just a person that was put in an unfortunate situation by this warrant. And all of these officers, when they got there, didn't know what they were getting into. They didn't know it was only going to be a family. And they believed, based on the sequence of events leading up to it, that people were in there who had a lot more to lose than the Leffy family did by the conduct of the warrant. They were on high alert, I think, because we're talking about large amounts of narcotics. How do you think this case is different from Franklin versus Foxford? I think it's different because the treatment of the appellants here was not harsh or unnecessary in any way. It's a completely normal part of execution to go into an un-guns-drawn and to use them to gain control of the situation. There's no claim here that this conduct went on for anything but a brief moment while they gained control of the situation in the living room and went about their business searching the rest of the house. Nobody asserts that it did. Nobody asserts that it was a prolonged or uncomfortable situation for the family. So as for the family members, I don't think there's any evidence in the record to show that it met the level of unreasonableness that appears in the other cases that we've talked about. If I were to, just as a hypothetical, I realize my summary execution may have been a little harsh. But let's suppose that instead of the fight as you describe it, they had grabbed Filiberto out of the shower and marched him into the courtroom and then beat him up in their presence. Would that be enough to create a circumstance where now that has in fact become part of the facts of the detention of the family? Well, I understand what you're saying. And I think what you're suggesting is that the totality of the circumstances can then become an actionable claim by people who weren't the target of it. And I don't think we have a case that says that. I don't think there's any suggestion that your constitutional right under the Fourth Amendment can be infringed by having somebody else's Fourth Amendment right violated. This claim was brought by them because they believe their rights to be free of an, of the police activity was infringed. I don't think there's anything in any of the record or that the district court can consider or in the opening brief here that suggests that Filiberto's Fourth Amendment rights or the unreasonableness, if it was there, of the police conduct toward him gives them personal rights to bring this claim. It was, it's never been addressed, and I don't think it's suggested by any of the authorities that have been presented to you. Yeah, that may be overstating the law, it seems to me. That is to, again, this is a hypothetical, but I'm not asking you to agree as a factual matter that this happens. But if the officers had come into that mobile home and  not physically harmed him in any way, and part of terrifying them was they take the nephew out and beat the daylights out of him, isn't the terror that's inflicted upon the children at some point a violation of the Fourth Amendment? I do believe it is. Yeah. Just as it is in the cases where they took an elderly man. So I think that tells us that your statement that there's simply no case, it's going to be a question of degree rather than there simply is no case that would allow this, it's a question of what happened and what's the evidence here taken as strongly as possible from their side, and you're saying that the evidence isn't there. I am. Yeah. And I'm saying that if you look at this case in general, and you asked some questions earlier about what the record shows, the record just doesn't allow us to get to the point where the Fourth Amendment rights of the family member were violated. There's just nothing there that the conduct of the police toward them was not this way. And the other part of it that has to do with Philberto Lepi is hotly disputed. There are claims against the city. There's no evidence in the record of a custom policy or practice of conducting unreasonable searches that's in this record. There's no evidence in this record that Sheriff Bannister had any part of it. He's an athlete here, that he started these acts in motion or that he failed to respond to, and the state law claims, I believe the briefs show, cannot be brought under Nevada law. If you have any further questions, I'd be happy to answer them.  Thank you. Thank you. Rebuttal? We're very, very clear on this. He's right, facts are hotly disputed. The facts as we see them and as the court below had to accept them was that Holub is a very, very bad actor, that Holub went in there and Officer White testifies that Philberto Lepi came out with his hands up, open. He lied about this kid having a knife. There's no question I thank counsel for agreeing that this did, in fact, go into the living area where the kids were. Holub is a very bad guy. He beats this kid by his own admission eight to ten times on the head with a pistol, a Glock, semi-automatic pistol. I think there's other testimony that it was more than that. It's in the record that he was bleeding. This kind of – this is far worse than either the Liston case or the Foxworth case, especially when you look at what's involved. In Liston, this was a bad actor, a guy named James Rocky Hill, who had – who allegedly had a gun. They had a reason to go over the top. In the Liston case, Foxworth, they didn't beat anybody up in that case. They took an old man who was infirmed, took him downstairs, and didn't put clothes on him. And it lasted a long time. But when you compare what happened in here in front of these children and what the children said and what they're going to live with the rest of their life, it strictly turns on the facts. This is a case of facts. And we ask the Court to take the view that the story that our facts have to be accepted, and this case needs to be tried. It needs – let's put Holub in front of a jury. That's all we want to do, put Holub in front of the jury and put those kids in front of a jury. And then we'll see who's telling the truth because the facts are hotly disputed. That's all we want. Thank you, Your Honor. Thank you very much. The case of Avalos v. Bannister is now submitted for decision.
judges: D.W. Nelson, W. Fletcher, Fisher